## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

**MARY E. THOMAS,**

      **Plaintiff,**

**vs.**                        **Case No.  1:17cv240-MW/CAS**

**NANCY A. BERRYHILL, Acting
Commissioner of Social
Security,**

      **Defendant.**

_____/

## <u>REPORT AND RECOMMENDATION</u>

This is a Social Security case referred to the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Acting Commissioner (Commissioner) of the Social Security Administration (SSA) denying Plaintiff's application for Supplemental Security Income (SSI) filed pursuant to Title XVI of the Social Security Act (Act) and an application for a period of disability and Disability Income Benefits (DIB) filed pursuant to Title II of the Act.  After consideration of the entire record, it is recommended that the decision of the Commissioner be affirmed.

## I. Procedural History

On January 6 and 16, 2014, Plaintiff, Mary E. Thomas, filed

applications for SSI and a period of disability and DIB, respectively, alleging

disability beginning November 1, 2013, based on anxiety attacks, high

blood pressure, memory loss, post-traumatic stress syndrome (PTSD),

sleep disorder, and essential hypertension.  Tr. 10, 57-58, 200-09, 236,

240.[1]  Plaintiff last met the insured status requirements for DIB on

December 31, 2018.[2]  Tr. 10, 12; *but see* Tr. 236, 275 (Dec. 31, 2017).

Plaintiff's applications were denied initially on May 14, 2014, and

upon reconsideration on July 14, 2014.  Tr. 10, 119-24, 130-31, 135-39.

On August 22, 2014, Plaintiff requested a hearing.  Tr. 10, 142-43.  The

video hearing was held on May 9, 2016, before Administrative Law Judge

(ALJ) Gregory J. Froehlich, presiding from Jacksonville, Florida.  Tr. 10, 38-

56.  Plaintiff testified during the hearing from Gainesville, Florida.  Tr. 41-

51.  Plaintiff was represented by Adam S. Neidenberg, an attorney, and

---

[1]  Citations to the transcript/administrative record, ECF No. 12, shall be by the symbol "Tr." followed by a page number that appears in the lower right corner.

[2]  To be eligible for DIB, a claimant must establish a disability prior to the expiration of his insured status, here, December 31, 2018.  *See* Moore v. Barnhart, 405 F. 3d 1208, 1211 (11th Cir. 2005).  For SSI claims, the relevant period is the month in which Plaintiff filed her SSI application, here January 16, 2014, through the date of the ALJ's decision, August 18, 2016.  *See* 20 C.F.R. § 416.501; Moore, 405 F.3d at 1211.

Mr. Routon (sp) during the hearing.  Tr. 10, 40, 125-26.  Donna P. Mancini, an impartial vocational expert, testified during the hearing.  Tr. 10, 51-55, 289-91 (Resume).

On August 18, 2016, the ALJ issued an unfavorable decision and determined that Plaintiff was not disabled from November 1, 2013, through the date of the ALJ's decision.  Tr. 10-22.  On October 15, 2016, Plaintiff's counsel filed a brief, Tr. 4, 292-96, and on October 17, 2016, Plaintiff requested review by the Appeals Council.  Tr. 4, 197-99.  On August 7, 2017, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6; *see* 20 C.F.R. § 404.981.

On October 5, 2017, Plaintiff, by counsel, filed a Complaint with this Court seeking review of the decision rendered by the ALJ.  ECF No. 1.  The parties filed memoranda of law, ECF Nos. 14 and 15, which have been considered.

## II.  Findings of the ALJ

The ALJ made several findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.  Tr. 10, 12.

2. The claimant has not engaged in substantial gainful activity since November 1, 2013, the alleged onset date.  Tr. 12.

3. The claimant has the following severe impairments: obstructive sleep apnea (OSA), hypertension, anxiety, obesity, bipolar disorder, post-traumatic stress disorder (PTSD), and osteoarthritis. Tr. 12. The ALJ noted that Plaintiff has the impairments consisting of hyperthyroidism, but "there is no evidence of any significant complications and/or work-related limitations due to these conditions documented in the record. Longitudinal notes on May 7, 2014, indicated that her hyperthyroidism no longer required medication and was well controlled (Exhibit 7F)." Tr. 13.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 13. The ALJ considered Listings 1.02 (major dysfunction of a joint) and 3.10 (sleep-related breathing disorder). *Id.* Regarding the latter issue, the ALJ considered Plaintiff's obesity pursuant to SSR 02-01p. Tr. 13-14; *see* SSR 02-01p, 2002 SSR LEXIS 1 (Sept. 12, 2002); *see* Tr. 17. The ALJ considered Plaintiff's mental impairments in light of Listings 12.04 (affective disorders) and 12.06 (anxiety-related). Tr. 14. Pursuant to the "paragraph B" criteria, the ALJ determined that Plaintiff had *moderate* restriction in activities of daily living, *moderate* difficulties in maintaining social functioning, and *moderate* difficulties in maintaining concentration, persistence, and pace, after noting that Plaintiff "had mild difficulties." The ALJ determined that Plaintiff "has experienced *no* episodes of decompensation, which have been of extended duration." *Id.* The ALJ also determined that the "paragraph C" criteria for Listing 12.04 were not satisfied. *Id.*

5. "The claimant has the residual functional capacity [RFC] to perform medium work as defined in 20 CFR 404.1567(c) and 416.965(c) that is further limited by occasionally stooping and no more than frequent handling and fingering bilaterally, but she can never balance. The claimant should avoid exposure to hazards including mechanical parts and unprotected heights. She can perform simple tasks with little variation that take a short period to learn (up to and including 30 days). The claimant will be able to deal adequately with supervisors and changes in a routine work setting, but she can only have occasional contact with coworkers and no contact with the public." *Id.*; *see infra* at 5-6, n.4.

6. The claimant is unable to perform any past relevant work, including "nursing aide (medium, unskilled) and residential tech (medium, semi-skilled)." Tr. 20. The vocational expert, however, classified Plaintiff's past work as nurse aide/healthcare tech, medium work, semi-skilled with an SVP of 4. Tr. 51; *see* Tr. 258 (work history report). The second position was classified as a residential care technician, medium work, skilled, with an SVP of 6. *Id.*

7. The claimant was 56 years old, which is defined as an individual of advanced age, on the alleged disability onset date. Tr. 20. The claimant has at least a high school education and is able to communicate in English. *Id.* Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules (the Grids) as a framework supports a finding that the claimant is not disabled, whether or not the claimant has transferable job skills. *Id.*

8. At step five of the sequential evaluation process, the ALJ, relying on the testimony of a vocational expert, determined that Plaintiff could perform several representative jobs[3] including *floor waxer*, *linen room attendant*, *laundry worker II*, and *food service worker*, all considered medium exertion level, unskilled work, with an SVP of 2.[4] Tr. 21, 52. In response to a second hypothetical which

---

[3] The vocational expert eliminated the job of "cleaner hospital" "based upon stooping." Tr. 52.

[4] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a). A Specific Vocational Preparation (SVP) of 1 means "short demonstration only." Dictionary of Occupational Titles (DOT) (4th ed., rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP. An SVP of 2 means "[a]nything beyond short demonstration up to and including 1 month." *Id.* "[SVP] is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Id.* Unskilled work corresponds to an SVP of 1-2 whereas semi-skilled work corresponds to an SVP of 3-4. Social Security Ruling (SSR) 00-4p, 2000 SSR LEXIS 8, at *8 (Dec. 4, 2000). Heavy work is defined as "lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds." *Id.* 20 C.F.R. § 404.1567(d). "Medium work involves lifting no more than 50 pounds at a

added that the hypothetical individual would be off task for 20% of the workday and at unpredictable intervals, the vocational expert opined that "[w]ith that degree of off task, Your Honor, it would preclude all competitive employment." Tr. 53. The vocational expert opined that employers' tolerance for absenteeism is "no more than two absences within a 30-day period." *Id.* The vocational expert advised that there were no conflicts with the DOT, but clarified that "the DOT does not address industry standards of absenteeism and off task and I can testify to those areas as I've worked in the field, met with employers, discussed with them those issues, and my testimony is a result of those conversations." *Id.*

9. The claimant has not been under a disability, as defined in the Social Security Act, from November 1, 2013, the date of the ALJ's decision. Tr. 21.

## III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. 42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v.

---

time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c); *see* Tr. 54. In part, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledges, and small tools." 20 C.F.R. § 404.1567(a). "Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *Id.*

<u>Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); *accord*

<u>Moore v. Barnhart</u>, 405 F.3d at 1211.  "The Commissioner's factual findings

are conclusive if supported by substantial evidence."  <u>Wilson v. Barnhart</u>,

284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[5]

"In making an initial determination of disability, the examiner must

consider four factors: '(1) objective medical facts or clinical findings; (2)

diagnosis of examining physicians; (3) subjective evidence of pain and

disability as testified to by the claimant and corroborated by [other

observers, including family members], and (4) the claimant's age,

education, and work history.'"  <u>Bloodsworth</u>, 703 F.2d at 1240 (citations

omitted).  A disability is defined as a physical or mental impairment of such

severity that the claimant is not only unable to do past relevant work, "but

cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the national

---

[5] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'"  <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. §§ 404.1505(a), 404.1509 (duration requirement).[6]

Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212 (2002).  In addition, an individual is entitled to DIB if she is under a disability prior to the expiration of her insured status.  *See* 42 U.S.C. § 423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

---

[6]  The relevant DIB and SSI regulations are virtually identical.  As a result, citations will be made to the DIB regulations found at 20 C.F.R. §§ 404.1500-404.1599, unless a SSI regulation provides otherwise.  The parallel regulations are found at 20 C.F.R. §§ 416.900-416.999, corresponding to the last two digits of the DIB citations, e.g., 20 C.F.R. § 404.1563(c) corresponds to 20 C.F.R. § 416.963(c).

3.  Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.  Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?

5.  Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work.  If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g). An ALJ may make this determination either by applying the grids or by

obtaining the testimony of a vocational expert.  <u>Phillips</u>, 357 F.3d at 1239-

40; *see* 20 C.F.R. pt. 404, subpt. P, app. 2.  If the Commissioner carries

this burden, the claimant must prove that he or she cannot perform the

work suggested by the Commissioner.  <u>Hale v. Bowen</u>, 831 F.2d 1007,

1011 (11th Cir. 1987).

Opinions on some issues, such as whether the claimant is unable to

work, the claimant's RFC, and the application of vocational factors, "are not

medical opinions, . . . but are, instead, opinions on issues reserved to the

Commissioner because they are administrative findings that are dispositive

of the case; i.e., that would direct the determination or decision of

disability."  20 C.F.R. § 404.1527(d); *see* <u>Bell v. Bowen</u>, 796 F.2d 1350,

1353-54 (11th Cir. 1986).  "[T]reating source opinions on issues reserved to

the Commissioner are never entitled to controlling weight or special

significance."  SSR 96-5p, 1996 SSR LEXIS 2, at *6 (1996).  Although

physician's opinions about what a claimant can still do or the claimant's

restrictions are relevant evidence, such opinions are not determinative

because the ALJ has responsibility of assessing the claimant's RFC.

A treating physician's opinions that a claimant is unable to work and

necessarily disabled would not be entitled to any special weight or

deference, however.  The regulations expressly exclude such a disability

opinion from the definition of a medical opinion because it is an issue reserved to the Commissioner and a medical source is not given "any special significance" with respect to issues reserved to the Commissioner, such as disability.  20 C.F.R. § 404.1527(d)(1), (3); SSR 96-5p, 1996 SSR LEXIS 2, at *6.  In Lewis v Callahan, the court noted "that we are concerned here with the doctors' evaluations of [the claimant's] condition and the medical consequences thereof, not their opinion of the legal consequences of his condition.  Our focus is on the objective medical findings made by each doctor and their analysis based on those medical findings."  125 F.3d at 1440.

Although not given the same controlling weight or deference as the opinion of treating physicians, the findings of a State agency medical consultant regarding the nature and severity of a claimant's impairments must be treated as expert opinion at the ALJ and Appeals Council levels of administrative review.  *See* SSR 96-6p, 1996 SSR LEXIS 3, at *4 (July 2, 1996) (rescinded and replaced by SSR 17-2p eff. Mar. 27, 2017).  The findings of a State agency medical consultant may provide additional evidence to support the ALJ's findings.  *See* Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986).

Plaintiff bears the burden of proving that she is disabled, and consequently, is responsible for producing evidence in support of her claim. *See* 20 C.F.R. § 404.1512(a); <u>Moore v. Barnhart</u>, 405 F.3d at 1211; <u>Ellison v. Barnhart</u>, 355 F.3d 1272, 1276 (11th Cir. 2003).

## IV.  Legal Analysis

### Substantial evidence supports the ALJ's determination that Plaintiff is not disabled.

### A.

Plaintiff raises two issues for the Court's consideration.  Plaintiff argues the ALJ's decision is not based upon substantial evidence because the ALJ failed to properly consider the medical opinion of the consultative examiner, Robert A. Greenberg, M.D.  Plaintiff also argues that the ALJ's bases for rejecting Plaintiff's limitations (failure to follow prescribed medical treatment) and mention of Plaintiff's work activity are not based on substantial evidence.[7]  ECF No. 14 at 3.

---

[7]  Although not given the same controlling weight or deference as the opinion of treating physicians, the findings of a State agency medical consultant regarding the nature and severity of a claimant's impairments must be treated as expert opinion at the ALJ and Appeals Council levels of administrative review.  *See* SSR 96-6p, 1996 SSR LEXIS 3, at *4 (July 2, 1996) (rescinded and replaced by SSR 17-2p eff. Mar. 27, 2017). The findings of a State agency medical consultant may provide additional evidence to support the ALJ's findings.  *See* <u>Jones v. Bowen</u>, 810 F.2d 1001, 1005 (11th Cir. 1986). However, as a one-time examiner, Dr. Greenberg's opinion was not entitled to any special deference.  *See* <u>Crawford v. Comm'r of Soc. Sec.</u>, 363 F.3d1155, 1160 (11th Cir. 2004).

B.

The ALJ began the RFC determination with a brief discussion of Plaintiff's hearing testimony and an Adult Function Report completed on January 26, 2014, which describes Plaintiff's daily activities.  Tr. 15-16; *see* Tr. 347-54.  The ALJ noted that Plaintiff's "report of disabling symptoms is rendered unpersuasive because they are not consistent with the treatment records or the claimant's reported activities."[8]  Tr. 16.  The ALJ refers to Plaintiff's work activity in 2014 after the alleged onset date, but notes that the earnings "did not rise to the level of substantial gainful activity."  *Id.* (citations omitted).  The ALJ also stated: "Although that work activity did not constitute substantial gainful activity, it does indicate that the claimant's daily activities have, at least at times, been somewhat greater than the claimant has generally reported."  *Id.*  The ALJ referred to what he called "inconsistent information provided by the claimant," and noted "the inconsistencies suggest that the information provided by the claimant generally may not be entirely reliable."  *Id.*

The ALJ then discussed part of the medical evidence:

_____

[8]  The ALJ may consider a claimant's daily activities when evaluating subjective complaints of disabling pain and other symptoms.  Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. § 404.1529(c)(3)(i).  *But see* Lewis v. Callahan, 125 F.3d at 1441 ("participation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant from disability).

Turning to the claimant's musculoskeletal impairments, testified that she was not able to work due to chronic numbness in her bilateral arms. The claimant has not generally received the type of medical treatment one would expect for disabled individual. A review of the record reveals limited and conservative treatment for this alleged impairment (Exhibit 20F). On January 29, 2016, the claimant sought follow up treatment for tingling and numbness sensation in her upper and lower extremities. Her EMG revealed mild carpal tunnel syndrome (CTS) on both sides, but no electrophysiological evidence for polyneuropathy. During follow up treatment on April 11, 20, the claimant's physician noted that her complaint of joint pain after rest was most consistent with osteoarthritis. Although she was prescribed Gabapentin at a very low dose, her physician recommended home exercise and NSAIDS for pain control as an affordable alternative (Exhibit 20F).[9]

Given the claimant's allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by the treating doctor. Yet a review of the record in this case reveals no restrictions recommended by the treating doctor.

As to her elevated blood pressure, medical records reveal that she was diagnosed with hypertension. Yet, the objective evidence is

---

[9] Records from the April 11, 2016, examination indicated that Plaintiff's gait and station were normal and the Romberg examination was normal. Tr. 740. Regarding "motor," it is noted: "Muscle strength in the extremities was normal and muscle tone was normal. Muscle bulk was normal and fasciculation were absent." Tr. 739. Regarding "sensory," it was noted, in part, "Distally decreased sensation to touch, pinprick and vibration below the knees. Proprioception was impaired bilaterally. Additional sensory examination was not performed." *Id*. Examination findings in the record indicate that Plaintiff had full (5/5) strength in the upper extremities and full ROM on examination, or similar findings. *See, e.g.*, Tr. 323, 358-59, 442, 471, 500, 520, 526, 550, 556, 576, 586, 591, 608-09, 617, 665, 679, 688, 694, 698, 705, 727, 733. Other records indicate that Plaintiff denied muscle and joint problem, but swelling was noted. *See, e.g.*, Tr. 662 (Oct. 5, 2015, muscle/joint problem; muscle pain; swelling); 676 (July 14, 2015); 725 (Mar. 16, 2016); 731 (Mar. 2, 2016); *but see* Tr. 357 (Nov. 17, 2013, positive for gait problem; per family, gait slower but steady); 426 (Oct. 10, 2013, right lower back pain); 668 (Sept. 9, 2015, slow gait with active ROM and positive limping); 671 (July 28, 2015, right sciatica 8/10; chronic hip pain); 714 (Mar. 10, 2016, ER note - gait steady and even; ambulation appropriate for age; sensation and movement intact bilaterally).

inconsistent with what one would expect for an individual with severe hypertension. The claimant's hypertension was being managed medically, and should be amenable to proper control by adherence to recommended medical management and medication compliance. The medical records show the claimant's blood pressure and is often within normal limits or only slightly elevated (Exhibits 12F, 15F, 19F and 20F). In addition, there is no evidence of any end organ damage, history of stroke, cardiovascular disease or functional limitations related to the claimant's elevated blood pressures. As such, it is clear that with treatments on an as-needed basis, simple monitoring, and medication compliance, these conditions will not limit the claimant's ability to perform basic work activities.

Turning to her sleep disturbances, medical records reveal that she was diagnosed with obstructive sleep apnea in 2015 (Exhibits 16F and 20F). However, the objective evidence is inconsistent with what one would expect for an individual with severe sleep apnea. Treatment records show that the claimant could not afford the sleeping machine, so she was never treated. Despite the fact that she was unable to purchase a CPAP, her physician prescribed sedatives to help her sleep. Yet, on March 15, 2015, progress notes indicated that she did not consistently utilize them (Exhibit 16F). This suggests that her symptoms were not as serious as alleged in connection with this application for disability benefits. It also shows that the claimant might not have been as serious in following the recommendations discussed by the treating physicians in order to prevent further medical complications or resulting impairments.

Tr. 16-17.

The ALJ then considered the impact of Plaintiff's obesity in accordance with SSR 02-1p and "determined that it had little effect on the claimant's ability to perform routine movement and necessary physical activity within the work environment. Tr. 17; *see* SSR 02-01p, 2002 SSR LEXIS 1 (Sept. 12, 2002).

The ALJ concluded this section of the RFC determination:

In addition to the limited objective medical evidence and conservative treatment, the claimant has several activities, which are inconsistent with the total inability to work.  As discussed above, she has admitted certain abilities, which provide support for the [RFC] in this decision (Exhibit 3E).  In summary, there is no objective evidence offered to show that these conditions cause a significant limitation in the claimant's ability to perform work-related functions.

Nevertheless, it is reasonable to believe the claimant may have some functional limitations associated with her physical impairments.  For that reason, the undersigned limited the claimant to medium exertional level work restrictions outlined in the [RFC].

Tr. 17-18.

Thereafter, the ALJ considered Plaintiff's mental impairments in light of existing treatment records in which "she was diagnosed with anxiety, bipolar disorder and posttraumatic stress disorder (PTSD) (Exhibits 5F, 8F, 13F, 14F and 17F).[10]  Yet, the objective evidence is inconsistent with what one would expect for an individual with severe anxiety, bipolar disorder and PTSD."  Tr. 18.  Based upon a review of treatment records, the ALJ concluded that Plaintiff had some functional limitations associated with her mental limitations.  As a result, the ALJ limited her "to performing simple

---

[10]  The ALJ considered a "Physician's Statement of Care on January 7, 2016," from Genae Brady, a case manager from Meridian Behavioral Healthcare (Meridian), who opined that Plaintiff "is not able to work," Tr. 632. Tr. 19.  The ALJ considered, but gave no weight to this opinion, in part, because the author was a 'non-acceptable medical source' and because the "opinion is inconsistent with the other evidence of record as a whole."  Tr. 19.

tasks with little variation that took a short period of time to learn (up to and including 30 days).  Additionally, the claimant would be able to deal adequately with supervisors and changes in a routine work setting, but she could only have occasional contact with coworkers and no contact with public," limitations noted in the RFC determination, Tr. 15.  Tr. 18.

Prior to considering Dr. Greenberg's evaluation, the ALJ gave "significant weight to treating sources" at several healthcare providers. Tr. 18.  He noted that "the doctors have provided long-term treatment with specialized knowledge and training, which could reasonably give them greater insight into the limitations imposed by the claimant's physical and mental impairments."  *Id.*  He further noted that several "treating source assessments did not contain any opinion regarding functional limitations, so the [ALJ did not consider] it for that purpose.  The records do support a finding that the claimant's conditions are controlled with treatment on an as needed basis."  *Id.*

## C.

The ALJ considered the consultative evaluation from Dr. Greenberg. Tr. 18-19.[11]

_____

[11]  After considering medical evidence pertaining to Plaintiff's physical condition and prior to discussing Dr. Greenberg's evaluation, the ALJ stated: "The evidence does

Moreover, the claimant underwent a consultative examination on May 7, 2014, conducted by Robert A. Greenberg, M.D. (Exhibit 7F) [Tr. 468-74]. The claimant reported high blood pressure for the past 20 years and lumbar pain that she sustained during a motor vehicle accident nine years ago. Positive findings from her examination included: the claimant's blood pressure was 150/92 and she weighed 263 pounds at 64 inched [sic] in height. There was no abnormal curvature of the cervical, thoracic, or lumbar spine present, but there was decreased range of motion of the lumbar spine and hips. However, she had full range of motion of all the other extremities. Based on her examination, Dr. Greenberg diagnosed hypertension and probable osteoarthritis of the lumbar spine and hips, aggravated by morbid obesity. *He opined that the claimant would be able to perform most work-related activities that did not require heavy lifting or bending* (Exhibit 7F) [Tr. 470]. The undersigned gives *substantial weight* to Dr. Greenburg's [sic] opinion regarding the claimant's physical impairments because it was consistent with the medical evidence of record such as the claimant's testimony and subjective complaints and other treating sources.

*Id.* (emphasis added).[12]  In reference to Plaintiff's back, Dr. Greenberg

further noted, in part:

No abnormal curvature of the cervical, thoracic, or lumbar spine was present. There was decreased ROM of the lumbar spine. There was positive straight[-]leg raising pain bilaterally at 45 degrees. Gait and station were normal. She did not require any assisting device for ambulation. She was able to tandem walk and could walk on her

---

not contain any opinions from treating physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision." Tr. 18.

[12]  Plaintiff identified four problem areas, Tr. 468, including her main physical problems.

4.  She was involved in a motor vehicle accident nine years ago, injuring her lumbar spine, and following this has had constant lumbar pain that radiates into the right leg, *aggravated by bending and lifting*. She also states that she cannot sit for longer than forty[-]five minutes at a time. She takes one Aleve tablet daily, which seems to help this. *Id.* (emphasis added).

heels and toes *but was unable to stoop*.  There was pain on ROM of the lumbar spine.

Tr. 469 (emphasis added).

The ALJ gave "significant weight" to the opinions of State agency medical consultants, Heather J. Hernandez, Ph.D., (Mar. 31, 2014), and Thomas Conger, Ph.D., (June 26, 2014), who provided functional statements of Plaintiff's mental ability based upon a review of available medical records, including 2014 mental health treatment records from Meridian.  Tr. 20; *see* Tr. 61, 64-65, 90, 94-95.  Plaintiff was limited to performing routine tasks on a sustained basis with limited exposure to the public.  Tr. 69, 83, 90, 99; *see* Tr. 15 ("She can perform simple tasks with little variation that take a short period to learn (up to and including 30 days). The claimant will be able to deal adequately with supervisors and changes in a routine work setting, but she can only have occasional contact with coworkers and no contact with the public.").

On July 13, 2014, P.S. Krishnamurthy, M.D., a Disability Determination Services (DDS) medical consultant, provided a functional statement that Plaintiff could perform medium exertion work opining, in part, that Plaintiff could occasionally lift and carry 50 pounds and frequently 25 pounds and stooping (i.e., bending at the waist), occasionally.  Tr. 19,

97-98, 110-12.  Dr. Greenberg's May 7, 2014, "medical opinion" is referenced as part of the "evidence of record" reviewed by Dr. Krishnamurthy.  Tr. 91, 105; *see* Tr. 97, 111 (referring to exertional limitations – "Severe decrease in ROM of both hips.  Gait & station – NL MOD decrease in lumbar spine ROM.  No changes in BIL UE & LE after repetitive muscle testing.  BIL hand grip = 4/5 w/ no change after repetitive activity. . . ."  *Compare with* Tr. 469 (Dr. Greenberg's recommendations).

Dr. Greenberg is referred to as a non-treating source.  Tr. 96, 105.  The "record source statement" states: "CE physician.  She should be able to perform most work-related activities that do no require heavy lifting or bending."  Tr. 105.  Dr. Krishnamurthy explained how he weighed Dr. Greenberg's opinion and stated: "Limits in lifting were incorporated into RFC."  Tr. 96; *see also* Tr. 110.  Occasional stooping is mentioned.  Tr. 97, 111.

The ALJ gave "partial weight to Dr. Krishnamurthy's opinion regarding the claimant's physical impairments because it was largely consistent with the medical evidence of record such as the claimant's testimony and subjective complaints and other treating sources, but he found that the claimant was more limited than as assessed in regard to her postural and

manipulative imitations."  Tr. 19; *see* Tr. 15 ("occasional stooping and no more than frequent handling and fingering bilaterally").

An RFC is the most a claimant can still do despite limitations.  20 C.F.R. § 404.1545(a)(1).  It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records.  *Id.*  An ALJ makes an RFC determination by considering the claimant's ability to sit, stand, walk, lift, carry, push, pull, stoop, crouch, and reach.  20 C.F.R. § 404.1545(b).  "Along with [a claimant's] age, education and work experience, the claimant's residual functional capacity is considered in determining whether the claimant can work."  Lewis, 125 F.3d 1436, 1440 (11th Cir. 1997); 20 C.F.R. § 404.1520(f).  To determine the physical exertion requirements of jobs in the national economy, the Commissioner classifies jobs as sedentary, light, medium, heavy, and very heavy.  20 C.F.R. § 404.1567.  Heavy work is defined as "lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds."  20 C.F.R. § 404.1567(d).  "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can also do sedentary and light work."

20 C.F.R. § 404.1567(c); *see* Tr. 54.  In part, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).  "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."  20 C.F.R. § 404.1567(a).  "Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  *Id.*

Although an ALJ considers medical source opinions, the responsibility for determining claimant's RFC lies with the ALJ.  20 C.F.R. § 404.1546(c); *see* SSR 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) (rescinded eff. Mar. 27, 2017) ("The term "residual functional capacity assessment" describes an adjudicator's finding about the ability of an individual to perform work-related activities.  The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence."); *see also* Cooper v. Astrue, 373 F. App'x 961, 962 (11th Cir. 2010) (unpublished) (explaining claimant's RFC

determination "is within the province of the ALJ, not a doctor").  The Court

will apply the SSR in effect when the ALJ rendered the decision.  *See*

*generally* <u>Bagliere v. Colvin</u>, No. 1**:**16CV109, 2017 U.S. Dist. LEXIS 8779,

at *10-18, (M.D. N.C. Jan. 23, 2017), *adopted*, 2017 U.S. Dist. LEXIS

51917 (M.D. N.C. Feb. 23, 2017).

As noted by Defendant, the ALJ did not adopt the exact terminology

used by Dr. Greenberg.  ECF No. 15 at 6.  Nevertheless, the ALJ's RFC

finding limiting Plaintiff to medium work is consistent with Dr. Greenberg's

opinion that Plaintiff could perform work that does not require heavy lifting.

Tr. 15.  By limiting Plaintiff to medium work, the ALJ precluded Plaintiff from

performing the heavy lifting required for both heavy and very heavy work.

*See* 20 C.F.R. § 404.1567(d), (e); *see supra* at 21-22.  Further, Dr.

Greenberg did not opine Plaintiff was unable to perform the lifting and

carrying for medium work, only "heavy lifting."  Tr. 470.  The ALJ did not err

in determining that Plaintiff could perform medium work based on the

Plaintiff's ability to lift, but do no "heavy lifting."

Defendant also argues that "Dr. Greenberg also did not limit Plaintiff

from all bending as Plaintiff suggests, but rather opined Plaintiff could

perform work that does not require 'heavy' bending (Tr. 470)."  ECF No. 15

at 7; *see* Tr. 470 (Dr. Greenberg "felt that this claimant should be able to

perform most work-related activities that did not require *heavy lifting or bending.*" (emphasis added).)  The argument continues that the ALJ "indicated Plaintiff could perform work that does not require constant or frequent bending (Tr. 470)."  ECF No. 15 at 7; *see* SSR 85-15, 1985 SSR LEXIS 20, at *18 (Jan. 1, 1985) (An activity, such as stooping, is done frequently, if it is done "from one-third to two-thirds of the time" and occasionally, if it is done "from very little up to one-third of the time.")[13]

Defendant argues the ALJ accounted for Dr. Greenberg's heavy bending limitations by limiting Plaintiff to no more than occasional stooping.[14]  Tr. 15.

---

[13]  b. Stooping, kneeling, crouching, and crawling are progressively more strenuous forms of bending parts of the body, with crawling as a form of locomotion involving bending.  Some stooping (bending the body downward and forward by bending the spine at the waist) is required to do almost any kind of work, particularly when objects below the waist are involved.  *If a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact. However, because of the lifting required for most medium, heavy, and very heavy jobs, a person must be able to stoop frequently (from one-third to two-thirds of the time); inability to do so would substantially affect the more strenuous portion of the occupational base.*  This is also true for crouching (bending the body downward and forward by bending both the legs and spine). However, crawling on hands and knees and feet is a relatively rare activity even in arduous work, and limitations on the ability to crawl would be of little significance in the broad world of work.  This is also true of kneeling (bending the legs at the knees to come to rest on one or both knees).

1985 SSR LEXIS 20, at *17-18 (emphasis added).  Plaintiff states that "occasionally means 1/3 of the day," ECF No. 14 at 17, when, by definition, it means "from very little up to one-third of the time."  *See* above.

[14]  Dr. Greenberg expressed his opinion in terms of what he felt Plaintiff could do rather than in terms of what Plaintiff could not do.  Tr. 470.

Except for "occasional stooping," Tr. 15, the ALJ did not include any

other postural limitations that might involve bending.  Tr. 15.  After posing a

hypothetical to the vocational expert that included "occasional stooping,"

the vocational expert opined that "past work would be eliminated."  She

identified, however, several representative jobs that such a person could

perform, including linen room attendant, laundry worker, and food service

worker jobs.  Tr. 21, 51-53.  (The vocational expert eliminated the job of

"cleaner hospital" because it included "stooping."  Tr. 52.)  The DOT

describes these jobs:

> 222.387-030 LINEN-ROOM ATTENDANT (hotel & rest.; medical ser.)
> Stores, inventories, and issues or distributes bed and table linen and
> uniforms in establishments, such as hotels, hospitals, and clinics:
> Collects or receives and segregates, counts, and records number of
> items of soiled linen and uniforms for repair or laundry, and places
> items in containers.  Examines laundered items to ensure cleanliness
> and serviceability.  Stamps items with identifying marks.  Stores
> laundered items on shelves, after verifying numbers and types of
> items.  Counts and assembles laundered items on cart or linen truck,
> records amounts of linens and uniforms to fill requisitions, and
> transports carts to floors.  Conducts monthly and yearly inventories to
> identify items for replacement.  Keeps linen room in clean and orderly
> condition.  May mend torn articles with needle and thread or sewing
> machine or send articles to SEWER, LINEN ROOM (hotel & rest.)
> 787.682-030. (hotel & rest.; medical ser.) GOE: 05.09.01STRENGTH:
> M - Medium Work - Exerting 20 to 50 pounds of force occasionally,
> and/or 10 to 25 pounds of force frequently, and/or greater than
> negligible up to 10 pounds of force constantly to move objects.
> Physical Demand requirements are in excess of those for Light Work.
> GED: R3 - LEVEL 3 - Apply commonsense understanding to carry
> out instructions furnished in written, oral, or diagrammatic form.  Deal

with problems involving several concrete variables in or from standardized situations.

361.685-018 LAUNDRY WORKER II (any industry)
Tends laundering machines to clean articles, such as rags, wiping cloths, filter cloths, bags, sacks, and work clothes: Loads articles into washer and adds specified amount of detergent, soap, or other cleaning agent. Turns valve to fill washer with water. Starts machine that automatically washes and rinses articles. Lifts clean, wet articles from washer and places them successively into wringers and driers for measured time cycles. Sorts dried articles according to identification numbers or type. Folds and places item in appropriate storage bin. Lubricates machines, using grease gun and oil can. May dissolve soap granules in hot water and steam to make liquid soap. May mend torn articles, using needle and thread. May sort and count articles to verify quantities on laundry lists. May soak contaminated articles in neutralizer solution in vat to precondition articles for washing. May mix dyes and bleaches according to formula, and dye and bleach specified articles. May be designated according to article cleaned as Bag Washer (any industry); Cloth Washer (any industry); Color-Straining-Bag Washer (textile); Oil-Rag Washer (any industry); Wiping-Rag Washer (tex. prod., nec). (any industry) GOE: 06.04.35STRENGTH: M - Medium Work - Exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Light Work. GED: R2 - LEVEL 2 - Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

319.677-014 FOOD-SERVICE WORKER, HOSPITAL (medical ser.)
Prepares and delivers food trays to hospital patients, performing any combination of following duties on tray line: Reads production orders on color-coded menu cards on trays to determine items to place on tray. Places items, such as eating utensils, napkins, and condiments on trays. Prepares food items, such as sandwiches, salads, soups, and beverages. Places servings in blender to make foods for soft or liquid diets. Apportions and places food servings on plates and trays according to diet list on menu card. Examines filled tray for

completeness and places on cart, dumbwaiter, or conveyor belt. Pushes carts to halls or ward kitchen. Serves trays to patients. Collects and stacks dirty dishes on cart and returns cart to kitchen. Washes dishes and cleans work area, tables, cabinets, and ovens. Collects and places garbage and trash in designated containers. May record amount and types of special food items served to patients. May assemble and serve food items to hospital staff in cafeteria. (medical ser.) GOE: 09.05.02STRENGTH: M - Medium Work - Exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Light Work. GED: R3 - LEVEL 3 - Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.[15]

*See* DOT, (4th ed., rev. 1991), § 222.387-030, § 361.685-018, and § 319.677-014.

In response to a second hypothetical, which added that the hypothetical individual would be off task for 20% of the workday and at unpredictable intervals, the vocational expert opined that "[w]ith that degree of off task, Your Honor, it would preclude all competitive employment." Tr. 53. The vocational expert opined that an employer's tolerance for absenteeism is "no more than two absences within a 30-day period." *Id*. The vocational expert advised that there were no conflicts with the DOT,

---

[15]   *See* Gore v. Berryhill, No. 3:17-CV-005 JD, 2018 U.S. Dist. LEXIS 43925, at *8 (N.D. Ind. Mar. 19, 2018) ("DOT 319.677-014, 1991 WL 672771 (food preparer requires occasional stooping")).

but clarified that "the DOT does not address industry standards of absenteeism and off task and I can testify to those areas as I've worked in the field, met with employers, discussed with them those issues, and my testimony is a result of those conversations." *Id.*

Plaintiff's counsel asked the vocational expert to assume that a person could stand up to a total of four hours, sit up to six hours during the day, but their standing and walking is no more than four hours and then some unpredictable times because of dizziness. And, this scenario might occur only three days out of a five-day week with the stand and walk predicates noted above. Tr. 54. The vocational expert opined that such a person would not be able to perform the representative jobs with a medium RFC. *Id.* In essence, the vocational expert opined that "[a]ll work would be jeopardized if the person were taking that many additional breaks," i.e., an additional 15 to 20 minutes or perhaps twice a day that they had to sit down or maybe more than. Tr. 55. The vocational expert was not asked questions regarding the extent of bending or stooping required for the representative jobs.

Plaintiff's counsel suggested to the ALJ that Plaintiff's RFC was "more of light RFC based on her problems with dizziness and problems with concentration. And likely the problems related to even vibration

besides heights and being away from dangerous machinery, and likely she could GRID out at a light RFC with the additional limitations that you provided."  Tr. 55.  Counsel did not refer to Dr. Greenberg's opinion nor suggest that Plaintiff could not perform the representative jobs because of Plaintiff's inability to bend, frequently or occasionally, or at all.

The ALJ discussed Dr. Greenberg's opinion and gave it substantial weight consistent with the other evidence in the record.  Tr. 18-19; *see* Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1179 (11th Cir. 2011).  Although Dr. Greenberg noted decreased ROM in the lumbar spine and hips, Tr. 472-73, Dr. Greenberg's conclusion that Plaintiff nevertheless would be limited to, at most, no "heavy" lifting and bending is supported by examination findings throughout the record showing that most often Plaintiff had full (5/5) strength in the upper extremities and full ROM on examination.  *See supra* at 14, n.9.  Dr. Greenberg also noted decreased grip strength (4-5) at the exam, Tr. 469, and Plaintiff had equal grip strength at a later examination, Tr. 617.  Notwithstanding some confusion with Dr. Greenberg's no "heavy lifting or bending" comments, Tr. 470, substantial evidence supports the ALJ's consideration of the medical evidence, including Dr. Greenberg's opinion.[16]

---

[16]  As noted herein, Dr. Krishnamurthy explained how he weighed

D.

Plaintiff argues the ALJ improperly denied Plaintiff benefits because she was noncompliant with prescribed medical treatment based, in part, on financial considerations.  ECF No. 14 at 19-23.  Plaintiff refers to several findings by the ALJ related to this issue.  ECF No. 14 at 20-21.  Plaintiff also argues the ALJ improperly considered her 2014 employment.  ECF No. 14 at 21-22.

The ALJ discussed these issues:

As mentioned earlier in Finding 2 above, the record reflects work activity after the alleged onset date.  The record reflects that the claimant earned $644.64 in 2014 while working at Angel's Unaware, Inc., but these earnings did not arise to the level of substantial gainful activity (Exhibits 2D, 3D, 4D, 5D, 6D and 7D).  Although that work activity did not constitute substantial gainful activity, it does indicate that the claimant's daily activities have, at least at times, been somewhat greater than the claimant has generally reported.[17]

* * * *

Turning to the claimant's musculoskeletal impairments, testified that she was not able to work due to chronic numbness in her bilateral arms.  The claimant has not generally received the type of medical treatment one would expect for disabled individual.  A review of the

---

Dr. Greenberg's opinion and stated: "Limits in lifting were incorporated into RFC." Tr. 96; see also Tr. 110.  Occasional stooping is also mentioned.  Tr. 97, 111.

[17]  Plaintiff has not demonstrated the ALJ erred when he considered Plaintiff's 2014 earnings.  See generally 20 C.F.R. § 404.1571 ("The work . . . that you have done during any period in which you believe you are disabled may show that you are able to work at the substantial gainful activity level."); Melton v. Apfel, 181 F.3d 939, 941 (8th Cir. 1999) (noting the claimant's part-time work after his alleged onset date is evidence undermining his subjective complaints).

record reveals limited and conservative treatment for this alleged impairment (Exhibit 20F).

\* \* \* \*

Turning to her sleep disturbances, medical records reveal that she was diagnosed with obstructive sleep apnea in 2015 (Exhibits 16F and 20F). However, the objective evidence is inconsistent with what one would expect for an individual with severe sleep apnea. Treatment records show that the claimant could not afford the sleeping machine, so she was never treated. Despite the fact that she was unable to purchase a CPAP, her physician prescribed sedatives to help her sleep. Yet, on March 15, 2015, progress notes indicated that she did not consistently utilize them (Exhibit 16F). This suggests that her symptoms were not as serious as alleged in connection with this application for disability benefits. It also shows that the claimant might not have been as serious in following the recommendations discussed by the treating physicians in order to prevent further medical complications or resulting impairments.

Tr. 16-17.

On March 5, 2015, Plaintiff had a visit with University of Florida Physicians in Gainesville, Florida, having been referred there by a physician for evaluation of sleep related disorders. Tr. 692. Plaintiff's history includes her report of poor sleeping; she has not consistently utilized sedatives to help her sleep; she has snoring and potential self noted apneas; she has EDS; snoring on a daily basis and loud; no prior PSG; Epworth sleepiness scale of 14. *Id.* After a review of systems, the impression was OSA. Tr. 694. The plan included an evaluation of sleep apnea among other considerations.

Tr. 694-95.  She was prescribed Lorazepam.  Tr. 695.  She was provided information regarding OSA, CPAP, and treatment.  *Id.*

A progress note for April 24, 2015, states: "Since I believe that she is a charity care patient, I will discuss the results when she returns later in May to determine how we can acquire a CPAP system for her."  Tr. 696.  It is noted that Plaintiff has moderately severe OSA "with improvement on CPAP with reduction of respiratory related events and improved oxygenation."  *Id.*  It was recommended that she initiate CPAP, consider utilizing heated humidification, and that she would benefit from weight loss. Alternative treatments were noted if she did not tolerate CPAP.  *Id.*

Plaintiff returned for a visit on May 18, 2015, and it is noted that at the last visit, a PSG was ordered to evaluate for sleep apnea.  Tr. 697.  She had a PSG on April 17, 2015, indicating severe sleep apnea and was titrated onto CPAP.  *Id.*  "Because she does not have insurance, she has not been able to start CPAP yet.  We discussed the results and the possibility of obtaining a machine via the American Sleep Association CPAP Assistance Program (Program), including the need for $100 fee to obtain.  She is willing to try this.  She states that during the study the nasal mask induced claustrophobia, but she was able to tolerate the nasal pillows

better."[18]  *Id.*  Her hypersomnia was severe.  *Id.*  The plan included ordering

a CPAP using an application for the Program and a CPAP script was

written.  Tr. 699.

On October 5, 2015, she returned for a follow-up of OSA symptoms.

Tr. 699.  It is noted, in part, that Plaintiff "has not consistently utilized

sedatives to help her sleep. . . . Patient has no income and was unable to

afford the [$]100 application fee for patient assistance.  She continues to

work on trying to get the funds to cover this.  Additionally applying for

disability and medicaid.  Her hypersomnia is severe, with a ESS of 20.  I

note during her study the best tolerated mask was nasal pillows."  *Id.*  It is

also noted that Plaintiff was "still looking for a [CPAP] machine, even calling

medical supply companies to see if they have any donated [CPAPS].  She

plans on continuing to try and get the resources for PAP."  Tr. 700; *see*

Tr. 703.

On November 16, 2015, she followed up and her chief complaint was

episodes of dizziness.  Tr. 703.  Among other notations, it is stated that

Plaintiff was diagnosed with OSA, but not on CPAP as she could not afford

the machine.  Tr. 704.  The assessment noted, in part, that the neurological

---

[18]  Plaintiff was consistent in reporting to health care providers that she did not
have a primary care provider or insurance.  *See, e.g.*, Tr. 709 (Feb. 26, 2016,
(Meridian)).

exam "is only notable for reduced reflex and distally decreased sensations, which is indicative of peripheral neuropathy, will get labs and EMG for further evaluation.  Otherwise, there was no focal deficits on neuro-exam. A recent brain MRI and MRA any head/neck were reviewed, which was unremarkable."  Tr. 705.

On April 11, 2016, Plaintiff followed up at Shands at the University of Florida in their Neurology Continuity Clinic.  Tr. 737 (Exhibit 20F).  It is restated that Plaintiff had been diagnosed with OSA the prior year, "[b]ut she could not afford the sleeping machine, so she was never treated." Tr. 737.  "Her labs were not done because she does not have insurance and she does not have income.  She is taking gabapentin, but only taking one capsule nightly.  She did try to contact some patient assistant program, but she was told the positions were already filled, she has to wait till the end of this year.  She was recently seen at the Equal Access Clinic Network, was told she will get blood tests done next week.  She has word finding difficulty and memory problem.  *Id*.  She had a neurological examination and it is noted, in part, under "motor," that her "[m]uscle strength in the extremities was normal and muscle tone was normal. Muscle bulk was normal and fasciculations were absent."  Tr. 739.  Gait and station and Romberg examination were normal.  Tr. 740.  The

assessment notes recount that she had previously "presented with a

balance problem, untreated OSA (recent sleep clinic appointment has to be

canceled as she does not even have a sleep machine)." *Id.*

> She may be able to get some lab work from the Equal Access Clinic
> Network.  She is currently taking Gabapentin, but at a very low dose.
> I tried to look up the discount programs from different pharmacies, but
> Gabapentin does not seem to be on the list.  Instructed patient that
> she can potentially increase the dose to one capsule TID if she is
> able to obtain this medication.  She is not treated for her OSA for at
> least one year now, which can certainly contribute to her symptoms of
> word finding difficulty and impaired memory, and may also potentially
> cause dizziness.  Informed patient that there is also increased risk for
> heart failure.  Patient said she is aware of these, and she has tried to
> contact assistance programs but has not been able to get a free
> machine.  Will send consult to social work for further help.  Her
> complaint of joint pain after rest is most consistent with osteoarthritis,
> which can also play a role in her impaired balance.  Ideally would like
> to refer patient to outpatient PT, but patient cannot afford it.  She may
> do home exercise and use PRN NASIDs for pain control.

Tr. 740.  The plan included "social work consult for financial help, most

importantly to help her get a sleep machine"; "continue gabapentin, may

increase dose if the patient is able to get more supply, but may be limited

due to financial issue"; "instructed patient to ask the Equal Access Clinic

Network if she is eligible to get outpt PT through that network"; and to

return in three months.  *Id.*

The ALJ accurately states that patient records note that Plaintiff did

not "consistently utilize sedatives to help her sleep."  Tr. 17, 692, 697, 699.

Plaintiff did not have a sleeping or CPAP machine and, as a result, the ALJ

stated "so she was never treated." Tr. 17. Simply stated, she could not afford one, not that she ever refused to use one. *See, e.g.*, Tr. 699, 704, 737. Based on these observations, the ALJ concluded that Plaintiff's "symptoms were not as serious as alleged" and she "might not have been as serious in following the recommendations discussed by the treating physicians in order to prevent further medical complications or resulting impairments." Tr. 17. As noted above, however, during the April 11, 2016, examination, Dr. Wang noted that Plaintiff had not been treated for over a year for her OSA "which can certainly contribute to her symptoms of word finding difficulty and impaired memory, and may potentially cause dizziness" and that there is "also an increased risk of heart failure." Tr. 740. It is uncertain how these statements affect Plaintiff's functionality in light of the ALJ's RFC.

Eleventh Circuit law establishes that failure to follow prescribed medical treatment without a good reason precludes a finding of disability. Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988). However, the Circuit has recognized that the inability to afford medication or treatment excuses non-compliance. *Id.*; *see also* Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003). If an ALJ denies benefits based on a failure to follow prescribed medical treatment, the ALJ must find "that had the claimant

followed the prescribed treatment, the claimant's ability to work would have been restored." Dawkins, 848 F.2d at 1213. If the ALJ denies benefits *solely* on the grounds of non-compliance, the ALJ "is required to determine whether the claimant was able to afford the prescribed treatment." Ellison, 355 F.3d at 1275. Here, the ALJ did not deny benefits solely on this basis.

Further, although a remediable controllable medical condition is generally not disabling, when a claimant cannot afford the prescribed treatment and can find no way to obtain it, she is excused from noncompliance. Dawkins, 848 F.2d at 1213. The burden of proving unjustified noncompliance is on Commissioner. *Id.* On the other hand, in Ellison v, Barnhart, the court held that the ALJ's failure to consider the claimant's ability to afford his seizure medication was not reversible error in that the ALJ did not significantly base his decision that the claimant is not disabled on a finding of noncompliance. 355 F.3d at 1275.

Social Security Ruling 82-59 provides further guidance on the issue of failure to follow prescribed treatment. SSR 82-59, 1982 SSR LEXIS 25, at *1-2 (Jan. 1, 1982).[19] When an ALJ finds a claimant to be under a

---

[19] "Social Security Rulings are agency rulings 'published under the authority of the Commissioner of Social Security and are binding on all components of the Administration.'" Sullivan v. Zebley, 493 U.S. 521, 530 n.9, 110 S. Ct. 885, 891 n.9, 107 L. Ed. 2d 967 (1990) (quoting 20 C.F.R. § 422.408 (1989)). Conversely, "'[r]ulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same. A ruling

disability, then the ALJ next must determine if a treatment prescribed by a treating source would restore the claimant's ability to work.  *Id*.  The ALJ then must analyze whether the failure to follow that prescribed treatment is justified.  *Id*.

The ALJ concluded that Plaintiff's lack of consistently utilizing sedatives to help her sleep indicated that her symptoms were not as serious as alleged, not that she would have the ability to work as determined in the RFC if she followed the prescribed regimen.  Further, at other points in the decision, the ALJ refers to her daily activities and concludes that her claim of disability is "not consistent with the treatment records or [Plaintiff's] reported activities.[20]  As discussed earlier, the claimant has admitted certain abilities, which provides support for the [RFC] in this decision (Exhibit 3E)."  Tr. 16; *see* Tr. 17.

During the hearing, the ALJ inquired of Plaintiff's sleep apnea.[21]

---

may be superceded, modified, or revoked by later legislation, regulations, court decisions or rulings.'"  Heckler v. Edwards, 465 U.S. 870, 874 n.3, 104 S. Ct. 1532, 1535 n.3, 79 L. Ed. 2d 878 (1984) (quoting Social Security Rulings iii (C.E. 1981)). Although SSRs are not binding on the court, they are accorded deference.  Fair v. Shalala, 37 F.3d 1466, 1469 (11th Cir. 1994).

[20]  *See supra* at 13 n.8.

[21]  The ALJ determined that Plaintiff's OSA was a severe impairment.  Tr. 12.

Tr. 42.  Plaintiff confirmed that she had not "been able to afford it yet,"
referring to a sleep apnea machine.  *Id*.  She described the results of her
sleep apnea, including the effect on her during the day.  *Id*.  Plaintiff
described the side effects from taking gabapentin -- it makes her a lot more
sleepier because she takes all of the them that make her sleep, "but they
don't really work anymore."  Tr. 47.  The ALJ did not ask Plaintiff if she had
anyone to help her pay for medications nor did he ask Plaintiff for
documentation of her financial circumstances.  *See generally* SSR 82-59,
1982 SSR LEXIS 25 at, *9-10.

Additionally, before the ALJ made his determination concerning
Plaintiff's lack of a justifiable reason for failing to follow prescribed
treatment, the ALJ should have informed Plaintiff of this fact and afforded
her an opportunity to show justifiable cause for failing to follow treatment.
*Id*. at *5.  This was not done here.  For example, why, on three occasions,
did she not consistently utilize sedatives to help her sleep as reported?
Tr. 17, 692, 697, 699.  The record is clear why she did not use a CPAP --
she could not afford one.  Tr. 42.  It is unclear why she did not "consistently
use sedatives."

Nevertheless, unfortunately for Plaintiff, aside from Dr. Greenberg's
noted limitation of no heavy lifting or bending, the medical evidence does

not support Plaintiff's claim of disability notwithstanding the ALJ's consideration of the other issues noted above which detract from his ultimate disability determination.

Therefore, the ALJ erred in his application of the legal standard for failure to follow prescribed treatment by failing to clearly indicate whether the claimant was not disabled, or was disabled and required medication; and by failing to adhere to the procedural requirements of SSR 82-59 to fully develop the record and provide sufficient notice and opportunity to the claimant to prove justifiable cause for failing to follow treatment. The issue then is whether the error is harmless. *See generally* Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983) (finding that ALJ's "erroneous statements of fact" were harmless because they did not affect the ultimate outcome of the case).

E.

Plaintiff bears the burden of proving that she is disabled, and consequently, is responsible for producing evidence in support of her claim. *See* 20 C.F.R. § 404.1512(a); Moore v. Barnhart, 405 F.3d at 1211; Ellison v. Barnhart, 355 F.3d at 1276. The Commissioner is charged with the duty to weigh the evidence, resolve material conflicts in testimony, and determine the case accordingly. *See* Watson v. Heckler, 738 F.2d 1169,

1172 (11th Cir. 1984). Even if this Court disagrees with the ALJ's resolution of the factual issues and would resolve the disputed factual issues differently, the decision must be affirmed where, as here, if supported by substantial evidence in the record as a whole. *See* Martin v Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).

The ALJ's mention of Plaintiff's non-compliance is not the primary or sole ground for the denial of disability benefits. *See* Ellison, 355 F.3d at 1275. The ALJ did not "primarily or not exclusively" rely on Plaintiff's failure to take medication. Plaintiff's conservative treatment and failure to consistently take sedatives were not the ALJ's sole or primary grounds for finding Plaintiff not disabled. Although the ALJ should have inquired further, substantial evidence supports the ALJ's decision that Plaintiff was not disabled. Any error here is harmless because the ALJ did not issue his unfavorable decision on these bases alone and gave additional reasons establishing good cause to give less weight to Plaintiff's limitations.

## V. Conclusion

Considering the record as a whole, the ALJ's findings are based upon substantial evidence in the record and, although the ALJ did not correctly apply the SSR noted above, the error was harmless. Accordingly, it is respectfully recommended that the decision of the Commissioner to deny

Plaintiff's applications for Social Security benefits be **AFFIRMED** and

Judgment entered for Defendant.

**IN CHAMBERS** at Tallahassee, Florida, on April 13, 2018.

**s/ Charles A. Stampelos**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

**<u>NOTICE TO THE PARTIES</u>**

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2). A copy of the objections shall be served upon all other parties. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b)(2). <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control</u>. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a Report and Recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.**